* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * * *Page 2 
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act and defendant-employer employs the requisite number of employees to be bound under the provisions of said Act at the time of the alleged accident.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. An employment relationship existed between plaintiff and defendant-employer on July 2, 2002.
4. On July 2, 2002, plaintiff earned an average weekly wage of $520.00, yielding a compensation rate of $346.68 per week.
5. Defendant-employer was insured by Federated Mutual Insurance Company.
6. Plaintiff underwent right hip surgery in September 2004.
7. Plaintiff claims temporary total compensation and medical benefits.
8. Plaintiff alleges he is entitled to temporary total compensation from April 13, 2004 to March 29, 2005.
9. The following stipulated exhibits were admitted into evidence at the Deputy Commissioner's hearing:
 (a) Stipulated Exhibit #1 — Industrial Commission Forms
 (b) Stipulated Exhibit #2 — plaintiff's medical records *Page 3 
10. The issues before the Full Commission are whether plaintiff sustained compensable injuries by accident to his hip and back on July 2, 2002, and, if so, what compensation plaintiff is entitled to receive.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Defendant-employer employed plaintiff as a heating and air conditioning unit (HVAC) installer and sheet metal mechanic. Plaintiff's HVAC duties included removing and reinstalling heating and air-conditioning duct systems in private homes or in commercial buildings, and lifting 100 to 150 pounds at any given time.
2. On July 2, 2002, plaintiff was removing ceiling duct work at the Selma Housing Authority when a grill fell out of the ceiling and struck him on the top of his head. Plaintiff was bleeding profusely from his head and a co-worker took him to Johnston Memorial Hospital for treatment. The emergency room physician's medical records document that plaintiff was awake, alert, and fully oriented. Plaintiff was dazed, but remembered the injury and his transport to the hospital. Plaintiff reported to the attendant that his chief complaint was his head, but he also complained of neck pain. A seven centimeter laceration to the top of plaintiff's head was also documented. X-rays of plaintiff's cervical spine revealed no evidence of fracture or dislocation. An orbital CT scan revealed no definite orbital fracture, but revealed two tiny calcifications in the periphery of the right cerebellar hemisphere adjacent to the inner table of the skull. A brain MRI was suggested to rule out a meningioma. The emergency room physicians closed plaintiff's laceration with stitches and discharged plaintiff with a prescription for Darvocet. *Page 4 
3. Defendants admitted liability for plaintiff's scalp injury and paid all associated medical expenses. At no time did plaintiff advise defendant-employer or any co-worker that he fell off the ladder and twisted his legs in the fall. Plaintiff did not tell the physicians in the emergency room that he fell and twisted his legs, so no additional diagnostic tests were done to determine if plaintiff required additional medical treatment.
4. Following the injury, plaintiff continued to work for defendant-employer in his same position.
5. On July 12, 2002, Johnston Memorial Hospital physicians removed plaintiff's staples from his scalp.
6. On July 17, 2002, defendants filed a Form 19 with the Commission to provide notice of plaintiff's injury. Defendants provided plaintiff with a copy of the Form 19. Plaintiff did not receive temporary total disability benefits related to this injury because he did not miss seven days from work.
7. On July 18, 2002, Wilson Medical Center performed a follow-up MRI of plaintiff's brain that revealed a small lacunar infarct within the anterior portion of the right external capsule, but no abnormalities within the orbits, suprasellar region, or occipital lobes.
8. On September 6, 2002, defendants filed a Form 28B with the Commission that provided the amount and types of benefits paid in the claim.
9. On August 31, 2002, plaintiff presented to Johnston Memorial Hospital with complaints of a toothache on the left lower side of his jaw. The toothache was not related to plaintiff's compensable workers' compensation injuries.
10. On October 4, 2002, plaintiff tendered his resignation to defendant-employer. Plaintiff advised defendant-employer that he obtained a position earning an additional $2.00 per *Page 5 
hour and which also involved HVAC installation, but that did not require plaintiff to crawl under residential houses.
11. On February 4, 2004, Dr. Thomas Hodgin, Jr. at the North Carolina Division of Vocational Rehabilitation Services (NCDVRS) examined plaintiff for complaints of multiple medical problems, including a possible hernia. Plaintiff advised Dr. Hodgin that his current job involved significant heavy lifting, and that during those times he felt a mass and pain in his groin. Additionally, plaintiff complained of chronic intermittent low back pain with radiation to his right leg to the level of the foot. Plaintiff informed Dr. Hodgin that the pain was becoming worse and that his right leg gave way. He also had intermittent neuropathic symptoms including numbness and tingling radiating down his leg in medial posterioral distribution. Plaintiff advised Dr. Hodgin that he suffered a head injury in 2002 and received a head CT and MRI testing. Plaintiff explained that he suffered daily from intermittent left hemicranial headaches lasting for approximately 30 minutes and that they began several months prior. Dr. Hodgin diagnosed plaintiff with reducible left inguinal hernia, chronic intermittent low back pain with radiation to the right leg, chronic intermittent headache neurologically nonfocal, and right carpal tunnel syndrome.
12. On February 16, 2004, Dr. Alberto d'Empaire at Carolina Regional Orthopaedics examined plaintiff upon referral from NCDVRS. Plaintiff reported a one-year history of low back pain with radiation to the right lower extremity and denied any previous injury to his low back. New x-rays of the lumbar spine were considered normal, with the exception of spina bifida occulta at L5. Pelvis x-rays showed a flat right femoral head mostly in the weight-bearing surface with increased density of the subchondral bone. Dr. d'Empaire suspected that plaintiff may have avascular necrosis (AVN) of the right hip and he recommended an MRI of both hips *Page 6 
and injections in the right sacroiliac joint in an attempt to alleviate plaintiff's tenderness. Dr. d'Empaire also recommended that plaintiff receive medical treatment with a general surgeon for his left inguinal hernia and he continued plaintiff's light duty work restrictions of no lifting over 25 pounds, no pulling, pushing, bending, squatting or climbing.
13. On March 19, 2004, Dr. d'Empaire reviewed MRI reports of plaintiff's left and right hips. They showed no evidence of AVN, but did reveal osteoarthritis of moderate severity of the right hip. Dr. d'Empaire opined that plaintiff would not need hip surgery anytime soon. He felt that plaintiff's osteoarthritis had been present for a long time and that plaintiff might require a total hip replacement when he got older.
14. Plaintiff also underwent EMG nerve conduction studies of both upper extremities, which showed bilateral carpal tunnel syndrome, more severe on the right than left. Plaintiff was injected in the right carpal tunnel and advised to continue wearing the cock-up splint at night. Plaintiff filed another claim for his carpal tunnel condition. As for his continuing pain in his right lower extremity, Dr. d'Empaire recommended a lumbar MRI. Plaintiff was continued on light duty restrictions of no lifting over 25 pounds, and no pulling, pushing, bending, climbing or squatting.
15. In April 2004, plaintiff contacted defendant-employer during job search efforts. Plaintiff did not advise defendant-employer that he had physical limitations and work restrictions that would have prevented him from performing any job duties that he had previously performed. However, defendant-employer did not hire plaintiff because they did not have an open position available for plaintiff at the time.
16. On May 5, 2004, Dr. d'Empaire reviewed plaintiff's lumbar spine MRI results, which revealed degenerative disc disease at L4-5, as well as severe left facet arthritis at L5-S1 *Page 7 
with a posterior synovial cyst in the facet. Dr. d'Empaire felt these problems were the cause of plaintiff's pain radiating to his left lower extremity and he referred plaintiff to continuing treatment with a spine specialist and scheduled an appointment for plaintiff.
17. On May 20, 2004, plaintiff filed a Form 18 with the Commission for the July 2, 2002 incident.
18. On May 24, 2004, Dr. David Miller, a back and neck specialist, examined plaintiff and reviewed the MRI and x-rays. Plaintiff advised Dr. Miller that a light fell on his head two years earlier and that he fell off a ladder. Plaintiff stated that he first experienced back and leg problems approximately two months after the incident. Dr. Miller diagnosed plaintiff with L4-5 stenosis with degenerative disc and joint disease bilaterally, left-sided degenerative disc disease with no left-sided symptoms, and severe right hip arthrosis. Dr. Miller opined that the major source of plaintiff's pain was his right hip joint, based on plaintiff's complaints of severe right groin pain. Dr. Miller prescribed an epidural cortisone injection at the L4-5 facet and a single walking cane for plaintiff to use with his left hand. Dr. Miller concurred with Dr. d'Empaire's assessment that plaintiff would most likely require a total right hip replacement in the future and that plaintiff could not continue working manual labor jobs. Dr. Miller continued plaintiff's pain prescription for Lorcet Plus.
19. On June 28, 2004, Guy A. Mazzone, PA, examined plaintiff for Dr. Miller. Plaintiff reported that the June 4, 2004 epidural cortisone injection did not alleviate his groin or thigh pain. Plaintiff felt that the pain was getting worse and stated that he had difficulty walking. Plaintiff walked with an antalgic gait on the right and exhibited pain with even a small amount of external and internal rotation of the right hip. Mr. Mazzone opined that plaintiff's chronic right *Page 8 
hip osteoarthritis was his major problem and he recommended referral back to Dr. d'Empaire for consideration of a right total hip replacement.
20. On August 12, 2004, Thomas J. Galisin, PA-C, examined plaintiff for Dr. d'Empaire. X-rays of plaintiff's right hip revealed a collapsed femoral head with degenerative changes. Mr. Gaslin diagnosed plaintiff with severe degenerative joint disease of his right hip. A total hip replacement was suggested and plaintiff elected to undergo the surgery. Dr. d'Empaire's office obtained payment approval from NCDVRS and coordinated plaintiff's medical clearance for surgery. Post-surgical recovery was estimated to require three days hospitalization, one and one-half days of rehabilitation, and six weeks of follow-up home health care services and home physical therapy.
21. On September 23, 2004, Dr. d'Empaire performed the complete right hip arthroplasty.
22. On October 21, 2004, Dr. d'Empaire examined plaintiff. He noted that plaintiff participated in physical therapy and prescribed plaintiff three additional weeks of physical therapy. Dr. d'Empaire advised plaintiff to continue dislocation precautions and toe touch at left lower extremity and to continue use of his walker.
23. On November 10, 2004, Dr. d'Empaire examined plaintiff and noted that plaintiff continued to improve. Dr. d'Empaire recommended that plaintiff progress to full weight-bearing with both lower extremities and that he use a cane for the next five weeks.
24. On December 1, 2004, Mr. Galisin examined plaintiff and obtained x-rays of his lumbar spine. Plaintiff stated that on the previous Friday while exercising, he bent over and felt a pop in his back and had not been able to straighten up since that time. Upon examination, plaintiff was ambulating with a cane and was hunched over. X-rays revealed some slight *Page 9 
decrease in disc height at L5-S1, but no acute fractures or dislocations. Mr. Galisin prescribed Vicoprofen, Skelaxin and a steroid dosepak for pain, as well as physical therapy three times a week for four weeks.
25. On December 10, 2004, Dr. d'Empaire examined plaintiff and noted plaintiff's continued improvement post right hip arthroplasty. Dr. d'Empaire advised plaintiff that he could discontinue using his cane, but that he should remain out of work for another six weeks.
26. On January 21, 2005, Dr. d'Empaire examined plaintiff post right hip arthroplasty. Dr. d'Empaire noted plaintiff's right lower extremity was approximately one-half inch longer on the right after the right hip replacement. Plaintiff presented wearing a lumbosacral brace and sought treatment for his lower back upon medical authorization from NCDVRS.
27. On March 4, 2005, Dr. d'Empaire examined plaintiff and noted he was doing significantly better. Dr. d'Empaire noted that plaintiff was experiencing pain in his lower back, but that it seemed to be resolving after taking Celebrex and Vicoprofen on an as-needed basis. Dr. d'Empaire opined that plaintiff would not be able to return to work in heating and air conditioning because plaintiff reported that he was unable to climb, squat and do deep knee bending. Plaintiff was excused from his regular work, scheduled for a six-week follow-up, and the medical report was forwarded to NCVRS.
28. From April 12, 2004 through March 29, 2005, plaintiff was unable to work while he recovered from his hip replacement surgery and was treated for lower back pain.
29. On April 15, 2005, Dr. d'Empaire examined plaintiff, who was doing significantly better. Plaintiff returned to work for another employer as a supervisor on March 29, *Page 10 
2005. Dr. d'Empaire recommended a follow-up right hip x-ray in one year and opined that plaintiff could continue working as a supervisor.
30. On October 6, 2005, Dr. d'Empaire examined plaintiff for complaints of significant pain in his lower back, despite wearing an industrial lumbosacral corset. The pain radiated into plaintiff's lower extremity. Plaintiff did not express complaints regarding his right total hip replacement. Physical examination revealed significant tightness of both hamstrings. Dr. d'Empaire diagnosed a severe lumbosacral muscle strain of a subacute type secondary to tight hamstrings bilaterally. Plaintiff was referred to physical therapy and assigned light duty restrictions of no lifting over 25 pounds, no pulling, pushing or bending, and to continue wearing the back brace.
31. On December 15, 2005, Dr. d'Empaire examined plaintiff for discomfort in the lumbosacral area. Plaintiff almost had a negative straight leg raise bilaterally, had deep tendon reflexes present and symmetric in both knees and both ankles, although plaintiff continued to be so symptomatic that he requested another consultation with Dr. Miller. Dr. d'Empaire ordered a new MRI of the lumbosacral spine and coordinated scheduling an appointment with Dr. Miller after the MRI was performed. Plaintiff was released to return to light duty work with restrictions of no lifting over 20 pounds, no pushing, pulling or squatting.
32. On January 18, 2006, Dr. Miller prescribed epidural injections and L4-5 and L5-S1 facet blocks to treat plaintiff's complaints of low back pain that failed to provide long-term relief.
33. A review of the medical records reveals that Dr. Miller, who primarily treated plaintiff's lower back condition, did not attribute plaintiff's complaints to a specific traumatic event arising out of the course and scope of the plaintiff's employment or any event that may *Page 11 
have occurred during the July 2002 accident. Dr. Miller was not deposed to provide his medical opinion regarding a causal connection between plaintiff's lower back condition and the July 2002 accident.
34. On February 15, 2006, Mr. Galisin examined plaintiff and diagnosed low back pain secondary to disc and joint disease without radiculopathy. Plaintiff did not wish any type of surgical intervention so an L4-L5 epidural injection was scheduled. Mr. Galisin prescribed a refill of Vicoprofen.
35. On March 24, 2006, Mr. Galisin found that plaintiff had pain with forward flexion, extension, lateral side bending and axial rotation; good range of motion in his hips with negative fabere; negative straight leg raises; patellar and Achilles tendon reflexes intact; good dorsiflexion strength of his ankles and great toes; no spasticity or clonus; and intact neurovascular system. The epidural injection performed on February 27, 2006 did not provide pain relief for plaintiff's lower back pain secondary to disc and joint disease with intermittent bilateral radicular symptoms. Plaintiff was referred for pain management.
36. On June 7, 2006, plaintiff fell down the steps in his home and injured his right hip. Nash General Hospital emergency room physicians administered initial medical treatment and advised plaintiff to schedule the follow-up appointment with Dr. d'Empaire. On June 13, 2006, Dr. d'Empaire examined plaintiff. He felt that plaintiff had a pulled muscle and derangement of the abductors of the right lower extremity and the right groin. He excused plaintiff from work through June 18, 2006, to return to light duty on June 19, 2006. The injuries sustained were categorized as insignificant and expected to resolve within approximately six weeks. *Page 12 
37. Dr. d'Empaire testified that he has not yet assigned plaintiff a permanent partial disability rating. He explained that usually after hip arthroplasty, a patient is eligible for a 20-25% rating and that plaintiff would probably be eligible for a 15% rating to his low back. Dr. d'Empaire stated that plaintiff would need to be seen once per year to follow-up on his hip, and that he may require a second hip surgery, injections to his back, and medications. Dr. d'Empaire deferred to Dr. Miller regarding any future back surgery plaintiff may need.
38. Dr. d'Empaire testified that a fall on July 2, 2002 could explain the development of plaintiff's osteoarthritis of the hip and lumbar spine; however, he did not know about plaintiff's injury at work until he was informed by plaintiff's attorney at his deposition. Dr. d'Empaire stated that it was unusual for plaintiff to not have hip or back pain for the seven months following his accident. He testified that plaintiff's hip and back condition as shown on the MRI could have happened from either a major trauma, like a fall, or after several years of heavy work, lifting, and bending. However, Dr. d'Empaire did not testify to a reasonable degree of medical certainty that plaintiff's hip and back conditions were related to a specific traumatic event arising out of and in the course of plaintiff's employment, like a fall from a ladder. In fact, he testified that assuming plaintiff did not fall from the ladder on July 2, 2002, he would have to assume that plaintiff's hip and back conditions had progressed for several years and that they were probably related to the heavy work he performed.
39. The Commission finds by the greater weight of the evidence that on July 2, 2002, plaintiff was struck on the head by a light fixture and that he sustained an approximately seven centimeter laceration to his head. However, the Commission finds that he did not fall off a ladder and twist his legs during the incident. Plaintiff did not tell his co-worker on the drive to the emergency room or the emergency room physicians about a fall from a ladder, nor did he *Page 13 
report it directly to defendant-employer. Plaintiff did not report any bruising or other problems when he received medical treatment to remove his scalp staples.
40. Dr. d'Empaire stated and the Commission finds that osteoarthritis can develop progressively over time or secondary to trauma or other conditions. Plaintiff's right hip was replaced as a result of osteoarthritis. Plaintiff also suffered from degenerative disc disease of his lumbar spine. However, the Commission finds that examinations and testing did not show that plaintiff developed a herniated disc associated with trauma. Plaintiff's lumbar MRI revealed facet arthrosis, which Dr. d'Empaire testified "goes with the arthritis," and a subchondral cyst, which Dr. d'Empaire testified is another finding of osteoarthritis. Dr. d'Empaire testified that all of these conditions are degenerative and develop progressively over time. The Commission finds that these changes that appeared on plaintiff's MRI indicated that the conditions either developed over several years or after years of heavy work that involved heavy lifting and bending and not as the result of an injury by accident.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On July 2, 2002, plaintiff sustained a compensable injury by accident to his scalp arising out of and in the course of his employment with defendant-employer when he was struck in his head by a light fixture. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has the burden of showing that the July 2, 2002 accident resulted in his right hip osteoarthritis and degenerative disc disease.Henry v. Leather Co., 231 N.C. 477, 57 S.E.2d 760 (1950). There is no expert testimony or evidence to establish that there is a causal *Page 14 
connection between the accident and plaintiff's lower back, leg, and hip conditions. Thus, plaintiff did not present competent evidence to support his contention that his hip osteoarthritis and lumbar degenerative disc disease were caused by the July 2, 2002 accident.Click v. Pilot Freight Carriers, 300 N.C. 164, 265 S.E.2d 389 (1980).
3. As plaintiff did not show that he sustained a compensable injury to his hip or back, plaintiff is not entitled to compensation from April 13, 2004 until March 29, 2005. N.C. Gen. Stat. § 97-29.
4. Plaintiff sustained a significant scar to his head as documented in the medical records. Defendants accepted liability for plaintiff's scalp injury and remain liable if plaintiff sustained disfigurement or damage to a vital organ pursuant to N.C. Gen. Stat. § 97-31.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for compensation for temporary total disability benefits from April 13, 2004 until March 29, 2005 is denied.
2. Plaintiff's claim for medical compensation for his lower back condition and right hip problems and/or for his hernia is denied.
3. The issue of any award for disfigurement or damage to a vital organ is RESERVED for future determination.
4. Each side shall pay its costs.
 This 25th day of September 2007. *Page 15 
S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/______________________ DIANNE C. SELLERS COMMISSIONER
 S/______________________ PAMELA T. YOUNG CHAIR *Page 1